**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT**

| | |
|---|---|
| OR ROTHSCHILD, individually and on behalf of all others similarly situated, | Case No. |
| Plaintiff, | **CLASS ACTION COMPLAINT FOR DAMAGES** |
| vs. | |
| STANLEY BLACK & DECKER, INC., | DEMAND FOR JURY TRIAL |
| Defendant. | |

Plaintiff Or Rothschild ("Plaintiff"), individually and on behalf of all others similarly situated, by and through counsel, brings this action against Defendant Stanley Black & Decker, Inc. ("Defendant" or "SBD"). The allegations contained herein are based on Plaintiff's knowledge as to Plaintiff and Plaintiff's own actions, on counsels' investigation, and on information and belief as to all other matters.

**NATURE OF THE CASE**

1.      This class action arises from SBD's retention of profits generated by price increases imposed on DEWALT-branded products in response to unlawful tariffs imposed by the federal government under the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. § 1701, et seq.

2.      In November 2024, SBD issued a letter which provided notice to consumers and warned that anticipated tariff actions of the incoming administration would require price increases on certain impacted products, and require SBD to update its pricing policies.

3.      Beginning in 2025, the federal government imposed sweeping tariffs on imports from numerous countries under purported authority of IEEPA. Those tariffs increased the cost of imported consumer goods sold in the United States.

1

4.      Importers and manufacturers relying on global supply chains responded by increasing prices on consumer goods to offset the cost of those tariffs. As a result, American consumers paid higher retail prices for consumer goods reflecting the economic burden of those tariffs.

5.      In response to the tariffs, SBD raised prices on DEWALT-branded products and related Tools & Outdoor products.

6.      SBD made numerous public statements that tied tariffs to pricing decisions.

7.      SBD confirmed in public investor materials that it implemented tariff-driven price increases, including a "high-single digit U.S. Tools & Outdoor price increase" tied to tariff impacts, and that further price action was required as a result of tariffs.

8.      The Supreme Court of the United States held that IEEPA did not authorize the challenged tariff regime.

9.      As a consequence of that decision, importers that paid IEEPA tariffs became entitled to seek refunds, reimbursements, reliquidation, abatements, exclusions, or other recovery associated with duties previously paid to U.S. Customs and Border Protection ("CBP").

10.     Upon information and belief, SBD has sought, preserved, or intends to seek refunds, reimbursements, abatements, exclusions, reliquidation, or other recovery associated with the same IEEPA tariffs that SBD publicly used to justify increased prices imposed on purchasers of DEWALT-branded products.

11.     SBD collected the economic burden of the tariffs from consumers through increased prices on DEWALT-branded products while retaining, or positioning itself to recover, the same tariff payments from the federal government.

12.     Unless restrained by this Court, SBD stands to recover the same tariff payments twice—once from consumers through tariff-inflated prices and again from the federal government through tariff refunds or other tariff-related recoveries, including interest or other payment enhancements available by law.

13.     SBD has made no legally binding commitment to return tariff-related price increases or overcharges to the consumers who actually paid them.

14.     Plaintiff brings this action on behalf of consumers who purchased DEWALT-branded products during the Class Period (defined herein) and who paid prices reflecting SBD's pass-through of unlawful tariffs.

15.     Plaintiff seeks restitution of those tariff-related overcharges, together with appropriate declaratory, injunctive, and monetary relief.

## JURISDICTION AND VENUE

16.     Federal subject-matter jurisdiction exists under 28 U.S.C. § 1332(d)(2) because: (a) at least one member of the proposed Class is a citizen of a state different from Defendant; (b) the amount in controversy exceeds $5,000,000, exclusive of interest and costs; and (c) none of the exceptions under that subsection applies to this action.

17.     The Court has personal jurisdiction over Defendant because SBD is incorporated in Connecticut, maintains its corporate headquarters at 1000 Stanley Drive, New Britain, Connecticut 06053, conducts substantial business in this District, and the challenged pricing and corporate policies were directed, controlled, approved, or implemented by SBD from Connecticut.

18.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendant resides in this District, maintains its principal executive offices in this District, and a substantial part of the events and conduct giving rise to the claims occurred in or emanated from this District.

3

**PARTIES**

19.    Plaintiff Or Rothschild is a resident and citizen of Waunakee, Wisconsin. During the Class Period, Plaintiff purchased one or more DEWALT-branded products subject to tariff-related price increases, as detailed below. Plaintiff paid retail prices for those products that were increased by SBD's tariff-related pricing actions to account for tariffs imposed on imported products and components. Plaintiff would not have paid those higher prices absent the unlawful tariffs and SBD's pass-through of those tariffs to consumers.

20.    Defendant Stanley Black & Decker, Inc. is a Connecticut corporation with its corporate headquarters located at 1000 Stanley Drive, New Britain, Connecticut 06053. SBD is a multinational manufacturer and seller of tools, hardware, outdoor equipment, and related consumer products.

21.    SBD owns and operates the DEWALT brand, one of its flagship professional tool brands and a central component of SBD's Tools & Outdoor segment. DEWALT products are manufactured, marketed, distributed, and sold through SBD, and SBD publicly reports the DEWALT brand financial performance and pricing activity as part of its consolidated operations. SBD describes its world class portfolio of trusted brands as including DEWALT.

**FACTUAL BACKGROUND**

**A. SBD's DEWALT Business**

22.    SBD is one of the largest manufacturers and distributors of professional-grade power tools, cordless tool systems, batteries, chargers, hand tools, outdoor equipment, and related products in the United States.

23.    SBD markets and sells a broad portfolio of products under the DEWALT brand, including professional power tools, cordless tool systems, lithium-ion batteries, outdoor power equipment, hand tools, accessories, and related products designed for contractors, tradespeople, industrial users, and consumers.

24.    DEWALT products are sold nationwide through major retailers and distributors, including Home Depot, Lowe's, Amazon, Acme Tools, Grainger, Fastenal, and numerous independent tool distributors and supply houses.

25.    SBD's Tools & Outdoor business depends heavily on the manufacture, importation, and distribution of products and product components sourced through global supply chains.

26.    DEWALT cordless tool systems and related products depend on imported lithium-ion battery cells, battery assemblies, chargers, motors, electronic components, castings, plastics, and other materials commonly sourced from overseas manufacturers.

27.    Because SBD relies on imported products and components for DEWALT and related Tools & Outdoor products, tariffs imposed on goods imported from China and other foreign jurisdictions directly affected SBD's cost structure during the Class Period.

28.    SBD publicly acknowledged this fact when it issued notices to customers and partners informing them of anticipated tariff-driven price increases on impacted SKUs and updates to its pricing policies.

29.    SBD's business operations, import practices, and tariff-related pricing policies are central to the claims asserted in this action because SBD seeks to retain the benefit of tariff-related price increases imposed on consumers while simultaneously retaining, preserving, or pursuing tariff-refund rights corresponding to the same unlawful tariffs.

5

30.     The exact amount of tariff-related price increases implemented by SBD is currently unknown but will be determined through discovery.

31.     On information and belief, SBD began imposing tariff-related price increases on DEWALT-branded products no later than April 2025 and did so in direct response to the federal government's imposition of IEEPA tariffs.

32.     SBD publicly admitted that tariffs affected its cost structure and that it chose to shift that tariff burden downstream through price increases.

**B.  The IEEPA Tariffs**

33.     Beginning in February 2025, President Donald J. Trump invoked IEEPA to impose tariffs on imports from numerous foreign countries pursuant to a series of executive orders declaring national emergencies related to trade, border, and supply chain concerns.[1]

34.     Those executive orders imposed sweeping tariffs on imports from key U.S. trading partners. The orders included duties of approximately 25 percent on many imports from Canada and Mexico and additional tariffs on imports from China that were layered on top of existing duties, resulting in substantially higher effective tariff rates on Chinese goods.[2]

---

[1] *See* Exec. Order No. 14194, *Imposing Duties To Address the Situation at Our Southern Border*, 90 Fed. Reg. 9117 (Feb. 7, 2025); Exec. Order No. 14193, *Imposing Duties To Address the Flow of Illicit Drugs Across Our Northern Border*, 90 Fed. Reg. 9113 (Feb. 7, 2025); Exec. Order No. 14195, *Imposing Duties To Address the Synthetic Opioid Supply Chain in the People's Republic of China*, 90 Fed. Reg. 9121 (Feb. 7, 2025).

[2] *See* Andrea Shalal, Jarret Renshaw & David Lawler, *Trump launches trade war with tariffs on Mexico, Canada and China*, Reuters (Feb. 1, 2025), https://www.reuters.com/business/trump-readies-order-steep-tariffs-goods-mexico-canada-china-2025-02-01/  (last accessed June 23, 2026).

35.     The tariffs significantly increased the cost of imported consumer goods entering the United States, particularly for retailers and other businesses that rely heavily on international supply chains to source merchandise—like SBD.[3]

36.     Under U.S. customs law, the importer of record is responsible for paying tariffs when goods enter the United States. Accordingly, importers of record—including SBD—were required to pay the IEEPA tariffs to U.S. CBP upon entry of covered merchandise into the country.[4]

37.     Numerous importers challenged the legality of the IEEPA tariffs in the United States Court of International Trade, arguing that President Trump lacked statutory authority under IEEPA to impose tariffs of that nature.[5]

38.     On May 28, 2025, the United States Court of International Trade held that IEEPA did not authorize the challenged tariff actions.[6]

39.     On February 20, 2026, the Supreme Court of the United States held that the challenged tariff regime was unlawful and that IEEPA does not authorize the President to impose tariffs of the type challenged in that litigation.[7]

---

[3] *See* Mary Amiti, Stephen J. Redding & David Weinstein, *The Impact of the 2018 Tariffs on Prices and Welfare*, 33(4) J. Econ. Persp. 187 (2020), https://pubs.aeaweb.org/doi/pdfplus/10.1257/jep.33.4.187 (last accessed June 23, 2026).

[4] *See* CBP, *Importing Into the United States: A Guide for Commercial Importers* (2006), https://www.cbp.gov/sites/default/files/documents/Importing%20into%20the%20U.S.pdf (last accessed June 23, 2026).

[5] *See* Reuters, *Trump administration sued over tariffs in US Court of International Trade*, The Business Standard (Apr. 15, 2025), https://www.tbsnews.net/worldbiz/usa/trump-administration-sued-over-tariffs-us-court-international-trade-1116021 (last accessed June 23, 2026).

[6] *See V.O.S. Selections, Inc., et al. v. The United States Of America*; *United States Customs And Border Protection, et al.*, Slip Op. No. 25-66 (Ct. Int'l Trade May 28, 2025), available at: https://www.cit.uscourts.gov/sites/cit/files/25-66.pdf (last accessed June 23, 2026).

[7] See *Learning Res., Inc. v. Trump*, 146 S.Ct. 628 (2026).

40.    The Supreme Court's decision eliminated the legal basis for the IEEPA tariffs and created a pathway for importers that had paid those duties to seek refunds of the tariffs previously collected by the federal government.

41.    The tariffs invalidated by the Supreme Court included tariffs imposed as part of the sweeping trade policy announced on April 2, 2025—referred to by the Trump administration as "Liberation Day." On that date, the President declared a national emergency and invoked IEEPA to impose broad tariffs on imported goods entering the United States.

42.    As part of the "Liberation Day" program, the federal government imposed a baseline tariff of approximately 10% on nearly all imports, with additional "reciprocal" tariffs targeting specific countries at higher rates, including major U.S. trading partners.

43.    These tariffs were implemented within days of the announcement, with baseline tariffs taking effect on or about April 5, 2025, and higher country-specific tariffs scheduled to take effect shortly thereafter.

44.    The tariff regime under IEEPA imposed a 34% tariff on imported power tools and a separate 54% IEEPA tariff on lithium-ion batteries for cordless tools, raising typical cordless drill-kit prices.[8] This is especially important here given SBD's products are imported power tools, and many rely on lithium-ion batteries and related parts.

45.    In response to the "Liberation Day" tariffs, and in anticipation of the same, companies that relied on imported goods and components, including companies like SBD, adjusted pricing, sourcing, and supply chain strategies to account for increased import costs.

---

[8] *See* TariffTax.org, *What's the Tariff on Power Tools?: Power tools from China and Mexico*, https://www.tarifftax.org/tariff-on/power-tools (last accessed June 23, 2026).

### C. Tariffs Are Economically Borne By Consumers

46.     Economists and government agencies have long recognized that tariffs are largely borne by domestic purchasers rather than foreign exporters or the importing firms that formally remit the duties.

47.     Tariffs function as a consumption tax because companies facing tariff-related cost increases typically incorporate those costs into pricing and pass them downstream through the supply chain.

48.     Economic studies examining recent U.S. tariff regimes consistently find that the cost of tariffs is passed through in the form of higher prices paid by U.S. purchasers of imported goods.[9]

49.     When tariffs increase the cost of imported goods, retailers and other downstream sellers typically raise prices to offset those additional costs. Surveys of U.S. businesses conducted by the Federal Reserve Bank of New York during the recent tariff period found that a large majority of companies facing tariff-related cost increases passed at least some portion of those costs through to their customers in the form of higher prices.[10] Companies consider tariffs to be costs that are to be incorporated into the pricing structure.

---

[9] *See* Julian Hinz, *et al.*, *America's Own Goal: Who Pays the Tariffs?*, Kiel Inst. for the World Econ. (Jan. 2026), https://www.kielinstitut.de/fileadmin/Dateiverwaltung/IfW-Publications/fis-import/92fb3f30-07b8-4dcf-b2bc-fbefb831f1a1-KPB201_EN.pdf (last accessed June 23, 2026); *see also* Mary Amiti, Stephen J. Redding & David Weinstein, *The Impact of the 2018 Tariffs on Prices and Welfare*, 33(4) J. Econ. Persp. 187 (2020), https://pubs.aeaweb.org/doi/pdfplus/10.1257/jep.33.4.187 (last accessed June 23, 2026).

[10] *See* Jaison R. Abel, Richard Deitz & Jason Bram, *Are Businesses Absorbing the Tariffs or Passing Them On to Their Customers?*, Fed. Rsrv. Bank of N.Y. Liberty Street Econ. (June 4, 2025), https://libertystreet economics.newyorkfed.org/2025/06/are-businesses-absorbing-the-tariffs-or-passing-them-on-to-their-customers/ (last accessed June 23, 2026).

50.     Similarly, the Federal Reserve Bank of Dallas recently confirmed that the 2025–2026 tariffs materially increased consumer prices and that "pass-through from the 2025 tariffs is effectively complete," meaning the costs of the tariffs were ultimately borne by purchasers of the affected products through higher prices.[11]

51.     The Dallas Federal Reserve further explained that tariff collections "boosted core goods PCE[12] inflation by approximately 2.2 percentage points" and increased overall core PCE inflation by approximately 0.8 percentage points, reflecting widespread downstream price increases imposed on consumers as businesses passed tariff costs through the supply chain.[13]

52.     These findings confirm that tariffs imposed during the relevant period functioned as a direct economic burden on consumers because businesses responded to tariffs by increasing prices charged to end purchasers rather than internally absorbing the additional costs.

53.     SBD is no different.

54.     During the Class Period, SBD increased prices on DEWALT and related Tools & Outdoor products in direct response to tariff changes.

55.     In its November 12, 2024 8-K, SBD noted that it "obtained price increases from customers to neutralize the remaining annual impact" of previous tariffs implemented in 2017-

---

[11] *See* Ron Mau & Tucker Smith, *Effects of realized tariff changes on PCE prices peaked in first quarter 2026*, Fed. Rsrv. Bank of Dall. (May 5, 2026), https://www.dallasfed.org/research/economics/2026/0505-mau (last accessed June 23, 2026).

[12] "PCE" refers to Personal Consumption Expenditures, an economic measure of how much consumers are spending on goods and services in the economy.

[13] *See* Ron Mau & Tucker Smith, *Effects of realized tariff changes on PCE prices peaked in first quarter 2026*, Fed. Rsrv. Bank of Dall. (May 5, 2026), https://www.dallasfed.org/research/economics/2026/0505-mau (last accessed June 23, 2026).

2018 pursuant to Section 301 of the Trade Act of 1974.[14] This evidences that SBD has historically used customer price increases to offset tariff costs.

56.     In a November 2024 investor presentation titled "Plan To Mitigate Higher Costs From Tariffs," SBD told investors that potential tariff increases could impose an estimated approximately $200 million annualized impact and identified customer-facing "Pricing Actions" as a "Critical Lever" to offset those costs. Specifically, SBD stated that it would "Pursue Pricing With Customers To The Extent Tariffs Are Implemented," and that its goal was to "Offset Through Mix Of Price & Supply Moves While Protecting Growth Investments."[15]



Figure 1[16]

---

[14] *See* Stanley Black & Decker, Inc., (Form 8-K) (Nov. 12, 2024), available at: https://www.sec.gov/Archives/edgar/data/93556/000119312524255101/d911994d8k.htm (last accessed June 23, 2026).

[15] *See* Stanley Black & Decker Nov. 12, 2024 Form 8-K, Ex. 99.1, at 3, available at: https://www.sec.gov/Archives/edgar/data/93556/000119312524255101/d911994dex991.htm (last accessed June 23, 2026).

[16] *Id*.

57.     On November 15, 2024, SBD issued a letter to customers stating that the anticipated tariff actions of the Trump administration "will require Stanley Black & Decker to increase prices on impacted SKUs," effective within thirty days of the tariffs taking effect. SBD further advised that it would update pricing and its Minimum Advertised Price policies in response to the tariffs.[17]

58.     On April 30, 2025, SBD issued a press release, which stated that "[i]n response to the United States' recent policy actions and to safeguard gross margins, the Company has implemented a high-single digit U.S. Tools & Outdoor price increase in April [2025], with plans to introduce a second price increase effective the beginning of the third quarter."[18]

59.     SBD's public filings and investor materials repeatedly tied pricing and financial performance to tariff-related price increases.

60.     In a July 29, 2025 press release, SBD represented that "the year-over-year changes for gross margin and adjusted gross margin were primarily due to a 3-point gross impact from tariffs and lower volume *partially offset by* the supply chain transformation efficiencies and *the initial benefits from our second quarter price increase*."[19]

61.     On the Q2 2025 earnings call on July 29, 2025, SBD President, CEO & Director Donald Allan stated: "[a]s you will hear from the team today, the organization is remaining focused

---

[17] *See* Stanley Black & Decker, Notice of Potential Changes Related to Tariffs (Nov. 15, 2024), available at: https://d3fnwqmod42ein.cloudfront.net/userfiles/documents/pdfs/tariff-updates/stanley-black-and-decker-notice-of-potential-changes-related-to-tariffs.pdf? (last accessed June 23, 2026).

[18] *See* Stanley Black & Decker, Q1 2025 Earnings Release (Apr. 30, 2025), available at: https://ir.stanleyblackanddecker.com/news-events/press-releases/news-details/2025/Stanley-Black--Decker-Reports-1Q-2025-Results/default.aspx (last accessed June 23, 2026).

[19] *See* Stanley Black & Decker, Q2 2025 Earnings Release (July. 29, 2025), available at: https://newsroom.stanleyblackanddecker.com/2025-07-29-Stanley-Black-Decker-Reports-2Q-2025-Results (last accessed June 23, 2026) (emphasis added).

on executing our robust plan designed to mitigate tariffs. We plan to leverage supply chain moves and *targeted pricing actions* to improve our gross margin in the coming quarters."[20]

62.     The Q3 2025 earnings call transcript confirmed the previous tariff related price increase and confirmed a second round. President, CEO, and Director Christopher Nelson confirmed the following: "[p]rice realization in the third quarter was consistent with our expectations based on the *April price increase*. Consistent with prior disclosure, *we are implementing a second price increase* during the fourth quarter to maintain our innovation and brand investments, *given the pressures resulting from tariff-related cost increases*."[21]

63.     By year-end 2025, SBD confirmed that tariff-related pricing actions were reflected in its actual financial results. In its February 4, 2026 release reporting fourth-quarter and full-year 2025 results, SBD reported that its Tools & Outdoor segment, which includes DEWALT, reported "higher pricing (+5%)" in that segment and attributed significant segment-margin expansion primarily to "higher pricing, *tariff mitigation*, and supply chain cost reductions."[22]

64.     These statements are mere examples of the public statements made by SBD and indicate that SBD elected to pass through all, or a substantial portion of, the purported tariff costs in the form of price increases to purchasers of DEWALT-branded products.

65.     SBD's statements constitute admissions that tariffs increased the cost of goods and that those increased costs were being passed downstream to consumers through price increases.

---

[20] *See* Stanley Black & Decker, Inc., Q2 2025 Earnings Call Transcript, at 8–9 (July 29, 2025), available at: https://s29.q4cdn.com/245094436/files/doc_financials/2025/q2/SWK-2Q25-Earnings-Call-Transcript.pdf (last accessed June 23, 2026) (emphasis added).

[21] *Id*.

[22] *See* Stanley Black & Decker, Inc., Stanley Black & Decker Reports 4Q and Full Year 2025 Results (Feb. 4, 2026), available at: https://ir.stanleyblackanddecker.com/news-events/press-releases/news-details/2026/Stanley-Black--Decker-Reports-4Q-and-Full-Year-2025-Results/default.aspx (last accessed June 23, 2026).

66.     As a result of this policy, consumers purchasing DEWALT-branded products during the Class Period paid prices that incorporated tariff-related increases implemented by SBD in response to the challenged tariffs.

67.     SBD did not disclose to consumers that tariff-related price increases imposed in response to the IEEPA tariffs might later result in SBD receiving both: (a) the benefit of tariff-inflated pricing paid by consumers; and (b) refunds or other recoveries corresponding to those same unlawful tariffs from the federal government.

68.     Consumers purchasing DEWALT-branded products during the Class Period paid additional amounts built into the prices of those products and tied to tariffs. These price increases functioned as a pass-through of tariff costs from SBD to its customers.

69.     As a result of Defendant's conduct, Plaintiff and Class members paid inflated prices for DEWALT-branded products due to the illegal IEEPA tariff regime.

70.     Plaintiff and Class members paid tariff-inflated prices during the Class Period, while SBD now seeks to retain both the consumer pass-through and any government refund or other recovery of the same unlawful tariff charges.

**D.  Tariffs Invalidated And Refund Rights**

71.     As described above, on February 20, 2026, the Supreme Court held that President Trump's tariff regime exceeded the statutory authority granted by IEEPA and invalidated the challenged tariff orders. Following that decision, importers that paid IEEPA tariffs became eligible to pursue refunds, reliquidation, abatements, reimbursements, or other recoveries of those duties.

72.     SBD is not alleged at this time to have filed a separate refund action in the Court of International Trade. Instead, Plaintiff alleges on information and belief that SBD has sought, preserved, or intends to seek refunds, reimbursements, abatements, exclusions, reliquidation, or

14

other recovery associated with the same IEEPA tariffs that SBD publicly used to justify tariff-related price increases imposed on purchasers of DEWALT-branded products.

73.     On March 4, 2026, the Court of International Trade, ordered CBP to stop liquidating IEEPA duties and to reliquidate previously liquidated IEEPA duties where possible, and indicated that the relief extended to "all importers of record" that paid IEEPA duties, including importers that had not filed their own refund suits.[23]

74.     The scale of the refund process is unprecedented. Public reporting estimates that approximately $166 billion in tariffs collected under the IEEPA regime must be refunded to more than 330,000 importers across roughly 53 million import entries.[24]

75.     Tariff refunds are not speculative or hypothetical. The invalidation of the IEEPA tariff regime created a pathway for importers and importers of record to recover duties paid under the unlawful tariff program.

76.     The refund process is already operational. On April 20, 2026, U.S. CBP  launched the first phase of its IEEPA duty refund process through the Automated Commercial Environment ("ACE") platform, using a new Consolidated Administration and Processing of Entries ("CAPE") system to process refund declarations submitted by importers of record and authorized customs brokers.[25]

---

[23] *See Atmus Filtration, Inc. v. United States*, No. 26-01259, 2026 WL 679285 (Ct. Int'l Trade Mar. 5, 2026).

[24] *See* Reuters, *U.S. says first refunds from Trump tariffs expected around May 11* (Apr. 29, 2026), https://www.reuters.com/legal/government/us-says-first-refunds-trump-tariffs-expected-around-may-11-2026-04-29/ (last accessed June 23, 2026).

[25] *See* How to Apply for Small Business Tariff Refunds, U.S. Chamber of Commerce (May 22, 2026), https://www.uschamber.com/co/start/strategy/how-to-apply-for-small-business-tariff-refunds. (last accessed June 23, 2026).

77. CBP has instructed importers that valid IEEPA duty refunds generally will be issued electronically within 60 to 90 days after acceptance of a CAPE Declaration, and that such refunds will include interest calculated from the date of deposit or estimated duty payment through liquidation or reliquidation of the applicable entry.[26]

78. Public reporting confirms that tariff refunds are, in fact, already being paid and processed at scale. CBP's tariff-refund activity materially increased in May 2026, with Treasury tracking data showing approximately $17 billion withdrawn by CBP as of May 20, 2026, compared to approximately $3 billion for all of April.[27]

79. Thus, SBD stands to recover substantial sums if tariff refunds or related recoveries are paid to SBD or to entities in SBD's import and distribution chain.

80. SBD can expect to recover, directly or indirectly, significant tariff-related refunds or recoveries corresponding to duties paid during the Class Period. Those expected recoveries are especially significant because SBD previously passed tariff-related cost increases through to consumers in the form of higher retail prices, meaning SBD now seeks to recover duties whose economic burden was borne, in whole or in part, by Plaintiff and Class members.

81. In practical terms, SBD stands to receive a windfall: it has already recovered tariff costs from consumers through tariff-related price increases, and it now stands to recover those same unlawful tariff payments from the federal government or from entities that receive such refunds or recoveries.

82.

---

[26] *Id*.

[27] *See* Tariff Refunds Are Showing Up—in a Big Way—on the Government's Bottom Line, Yahoo Finance, https://finance.yahoo.com/markets/article/tariff-refunds-are-showing-up--in-a-big-way--on-the-governments-bottom-line-143000682.html. (last accessed June 23, 2026).

**PLAINTIFF'S EXPERIENCE**

83.     Plaintiff, Or Rothschild, is a purchaser of DEWALT-branded products.

84.     Plaintiff Rothschild made purchases during the Class Period where Plaintiff was charged prices increased due to tariffs.

85.     For example, on or about April 19, 2025, Plaintiff Rothschild purchased a DEWALT 20V MAX DCBL722B handheld blower from Ace, a DEWALT ATOMIC 20V MAX cordless brushless 3/8-inch impact wrench, and a DEWALT 20V MAX 6.0Ah lithium-ion battery; a DEWALT 20V MAX cordless battery-powered lawn edger from Home Depot on or about April 19–20, 2025; a DEWALT DCL050 20V MAX LED work light and a DEWALT DCG410VSB 20V MAX XR paddle switch grinder from Amazon on or about April 28, 2025; a DEWALT DW8530 3-inch diamond multi-material blade and a DEWALT DCS438B 20V MAX XR 3-inch cut-off tool kit from ToolUp on or about April 29, 2025; a DEWALT 20V MAX XR cordless 5-inch brushless random orbit sander from Ace on or about May 6, 2025; a DEWALT 8-inch pole saw chain and a DEWALT DCHT821B 22-inch 20V battery hedge trimmer from Ace on or about July 10, 2025; and a DEWALT DCCS623B 20V MAX 8-inch pruning chainsaw and DEWALT DCF510B 20V XR brushless ratchet from Amazon on or about July 10, 2025.

86.     Upon checkout, Plaintiff Rothschild was charged a price that, based on the evidence alleged above, was increased due to SBD's tariff-related pricing actions and the illegal IEEPA tariff regime.

87.     Plaintiff Rothschild is entitled to restitution, disgorgement, damages, and/or other relief for all tariff-related overcharges paid in connection with Plaintiff's purchase of DEWALT-branded products, plus interest and all other relief available by law.

**CLASS ALLEGATIONS**

88.    A class action under Fed. R. Civ. P. 23is the proper form in which to bring Plaintiff's claims. The potential Class [28] is so large that joinder of all members would be impracticable. Additionally, there are questions of law or fact common to the Class, the claims or defenses of the representative parties are typical of the claims or defenses of the Class, and the representative parties will fairly and adequately protect the interests of the Class.

89.    This action satisfies all of the requirements of the Federal Civil Rules, including numerosity, commonality, typicality, adequacy, predominance and superiority.

90.    **Numerosity**: the Class is so numerous that joinder of all members is impracticable. While the exact number is not known at this time, it is generally ascertainable by appropriate discovery. Given the consumer base of SBD, the class numbers in the hundreds of thousands or millions of consumers.

91.    **Commonality:** the claims made by Plaintiff meets the commonality requirement because they present shared questions of law and fact, and resolving these questions will resolve the classwide litigation. These shared questions predominate over individual questions, and they include, without limitation:

      a. whether SBD paid tariffs imposed under IEEPA on imported goods during the Class Period;

      b. whether SBD increased retail prices on goods sold to consumers in response to those tariffs;

---

[28] The "Class" as used herein is defined as the Nationwide Class and the Wisconsin Sub-Class below.

c. whether SBD passed through some or all of the tariff costs to consumers through higher prices;

d. whether SBD sought or will seek refunds of those tariffs from the federal government;

e. whether SBD's retention of tariff refunds corresponding to tariff costs paid by consumers constitutes unjust enrichment;

f. whether SBD's conduct was unfair under applicable consumer protection laws; and

g. the appropriate measure of restitution, damages, or other relief resulting from SBD's conduct.

92. **Typicality**: Plaintiff's claims are typical of those of the other Class members because Plaintiff, like every other Class member, bought products from SBD subject to tariff related price increases.

93. The claims of the Class Representative Plaintiff are furthermore typical of other Class members because he makes the same claims as other Class members. Plaintiff has an interest in seeking compensation from Defendant.

94. **Adequacy**: Plaintiff will fairly and adequately represent and protect the interests of the Class in that he has no disabling conflicts of interest that would be antagonistic to those of the other members of the Class. Plaintiff seeks no relief that is antagonistic or adverse to the members of the Class and the infringement of the rights and the damages they have suffered are typical of other Class members.

95. **Superiority:** Class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a

19

large number of class members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain class members, who could not individually afford to litigate a complex claim against large corporate defendants. Further, even for those class members who could afford to litigate such a claim, it would still be economically impractical.

96.     The nature of this action and the nature of laws available to Plaintiff and the Class makes the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiff and the Class for the wrongs alleged. Without the class action mechanism, Defendant would necessarily gain an unconscionable advantage since they would be able to exploit and overwhelm the limited resources of each individual Class member with superior financial and legal resources; and the costs of individual suits could unreasonably consume the amounts that would be recovered. Likewise, proof of a common course of conduct to which Plaintiff was exposed is representative of that experienced by the Class, and will establish the right of each member of the Class to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

97.     The proposed Nationwide Class is described as follows:

**All persons in the United States who purchased goods from SBD during the Class Period on which SBD increased prices due to IEEPA tariffs.**

98.     The proposed Wisconsin Subclass is described as follows:

**All persons in Wisconsin who purchased goods from SBD during the Class Period on which SBD increased prices due to IEEPA tariffs.**

99.     Excluded from the Class are: Defendant and any entities in which Defendant has a controlling interest; any entities in which Defendant's officers, directors, or employees are

employed and any of the legal representatives, heirs, successors, or assigns of Defendant; the Judge to whom this case is assigned and any member of the Judge's immediate family and any other judicial officer assigned to this case; all persons or entities that properly execute and timely file a request for exclusion from the Class; and any attorneys representing the Plaintiff or the Class.

100.    The "Class Period" is the period during which Defendant assessed tariff related charges to consumers. The precise contours of the Class Period can only be determined through discovery. In no event shall the Class Period be less than the period beginning on the date established by the Court's determination of any applicable statute of limitations, after consideration of any tolling, concealment, and accrual issues, and ending on the date of entry of judgment or preliminary approval of a settlement.

101.    Plaintiff reserves the right to modify or amend the definition of the proposed class, Class Period, and proposed subclasses, before the Court determines whether certification is appropriate and as the parties engage in discovery.

102.    Plaintiff will fairly and adequately protect the interests of the Class. The interests of the class representative are consistent with those of the other members of the Class. In addition, Plaintiff is represented by experienced and able counsel who have expertise in the areas of tort law, trial practice, and class action representation.

103.    The class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Because of the number and nature of common questions of fact and law, multiple separate lawsuits would not serve the interest of judicial economy.

**CLAIMS FOR RELIEF**

**COUNT I**
**Unjust Enrichment**
**(On behalf of Plaintiff and the Class)**

104.    Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

105.    Plaintiff and the Class conferred a benefit upon Defendant in the form of money Defendant received, directly or indirectly, from tariff-related price increases imposed on DEWALT-branded products during the Class Period.

106.    Defendant appreciates and/or has knowledge of the benefits conferred upon it by Plaintiff and the Class.

107.    Under principles of equity and good conscience, Defendant should not be permitted to retain the amount of tariff-related overcharges obtained from Plaintiff and members of the Class, which Defendant unjustly obtained as a result of price increases on products subject to unlawful tariffs.

108.    Defendant has retained profits generated from sales of DEWALT-branded products subject to tariff-related price increases and should not be permitted to retain those ill-gotten profits while also seeking, preserving, or receiving refunds or other recoveries of the duties it paid or caused to be paid.

109.    Accordingly, Plaintiff and the Class seek full disgorgement and restitution of money Defendant retained as a result of the unlawful and/or wrongful conduct alleged herein.

22

## COUNT II
## Money Had and Received
### (On behalf of Plaintiff and the Class)

110. Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

111. Defendant received money from Plaintiff and each member of the proposed Class in the form of tariff-related price increases or overcharges on DEWALT-branded products. The Supreme Court has determined that the tariffs were unlawful.

112. The money belonged to Plaintiff and to each member of the proposed Class.

113. Defendant has not returned the money.

114. It would offend equity and good conscience if Defendant were permitted to retain the tariff-related overcharges. Plaintiff seeks the return of that money in an amount to be proven at trial.

115. Plaintiff seeks all remedies available under the law, including actual damages, nominal damages, compensatory damages, punitive damages where available, injunctive relief, restitution, disgorgement, interest, and all other remedies available by law.

## COUNT III
## Violation Of The Wisconsin Deceptive Trade Practices Act
### Wis. Stat. § 100.18, *et seq.*
### (on behalf of Plaintiff and the Wisconsin Sub-Class)

116. Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

117. Wisconsin Statute § 100.18, *et seq.*, prohibits corporations and other business entities, with intent to sell merchandise to the public, from making or disseminating statements, representations, or omissions to the public that are untrue, deceptive, or misleading.

23

118. During the Class Period, SBD engaged in unlawful, unfair, deceptive, and misleading trade practices in Wisconsin in connection with the marketing, pricing, distribution, and sale of DEWALT-branded products.

119. SBD publicly represented that tariffs imposed under IEEPA required SBD to increase prices on DEWALT-branded products sold throughout the United States, including products sold in Wisconsin.

120. SBD disseminated these representations through public filings, investor presentations, press releases, earnings calls, customer letters, pricing communications, Minimum Advertised Price policy updates, and other statements made in connection with the sale, pricing, and distribution of DEWALT and other Tools & Outdoor products.

121. SBD also disseminated these representations, in the form of material omissions, directly to consumers via the communicated sale price of their products at the time of purchase. Consumers were exposed to such misrepresentations and omissions during the marketing and sale of SBD products.

122. SBD's statements and omissions were deceptive and misleading because SBD failed to disclose that: (a) SBD intended to preserve and pursue tariff-refund rights corresponding to those same tariffs; (b) the tariffs were being actively challenged as unlawful; and (c) SBD could ultimately retain both tariff-related price increases paid by consumers and refunds of those same tariffs from the federal government.

123. SBD likewise failed to disclose that consumers would not receive reimbursement, credits, refunds, or corresponding price reductions if SBD later recovered those tariff amounts from the government.

24

124.    SBD's omissions and representations were material because reasonable consumers would consider it important that SBD intended to seek recovery of the same tariff costs it had already incorporated into consumer pricing.

125.    SBD's conduct was immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers.

126.    Plaintiff and members of the Class suffered loss as a direct and proximate result of SBD's deceptive and misleading conduct because they paid inflated prices for SBD products reflecting tariff-related increases implemented by SBD.

127.    Had Plaintiff and members of the Class known the true facts, including that SBD intended to seek refunds of the same tariff costs embedded in product pricing, they would have acted differently, including by declining to purchase SBD products or paying less for them.

128.    SBD's deceptive practices substantially affected Wisconsin commerce and consumers throughout the Class Period.

129.    As a direct and proximate result of SBD's conduct, Plaintiff and members of the Class suffered ascertainable losses in amounts to be proven at trial.

130.    Pursuant to Wis. Stat. § 100.18, Plaintiff and members of the Class seek all available relief, including pecuniary damages, restitution, equitable relief, attorneys' fees, costs, and such further relief as the Court deems just and proper.

**COUNT IV**
**Declaratory Relief, 28 U.S.C. § 2201**
**(On behalf of Plaintiff and the Class)**

131.    Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

132. Federal courts have the power "to declare the rights and other legal relations of any interested party seeking such a declaration." 28 U.S.C. § 2201(a).

133. Plaintiff's claims present an actual controversy as to the rightful ownership of tariff-related overcharges paid to Defendant or retained by Defendant as a result of tariff-related price increases on DEWALT-branded products.

134. Plaintiff has suffered injury by having been required to pay tariff-inflated prices because of the subject tariffs on Defendant's products. Plaintiff and the Class will suffer additional injury if Defendant is permitted to retain tariff-related overcharges while also retaining, seeking, or receiving tariff refunds or related recoveries.

135. This Court can exercise its equitable power to enter a declaratory judgment that Defendant's retention of tariff-related overcharges paid by Plaintiff and the Class, while Defendant receives or seeks tariff refunds or related recoveries corresponding to the same tariffs, is unlawful for the reasons alleged herein.

## PRAYER FOR RELIEF

136. WHEREFORE, Plaintiff and members of the proposed Class pray for relief and judgment against Defendant as follows:

    a. For an order certifying the proposed Classes, appointing Plaintiff and Plaintiff's counsel to represent the proposed Classes, and directing notice to the proposed Classes to be paid by Defendant;

    b. For damages suffered by Plaintiff and members of the proposed Classes;

    c. For restitution to Plaintiff and the proposed Classes of all monies wrongfully obtained or retained by Defendant;

d. For disgorgement of all tariff-related overcharges, refunds, recoveries, profits, benefits, and unjust enrichment Defendant obtained as a result of the conduct alleged herein;

e. For injunctive relief requiring Defendant to cease and desist from engaging in the unlawful, unfair, and/or deceptive practices alleged in this Complaint;

f. For declaratory relief, retrospective and prospective injunctive relief as permitted by law or equity, including enjoining Defendant from continuing the unlawful practices alleged herein and requiring appropriate relief to remedy Defendant's past conduct;

g. For Plaintiff's reasonable attorneys' fees, as permitted by law;

h. For Plaintiff's costs incurred;

i. For pre-judgment and post-judgment interest at the maximum allowable rate on any amounts awarded; and

j. For such other and further relief that this Court deems just and proper under equity or law, including punitive damages where available.

Dated: June 25, 2026                               Respectfully submitted,

*/s/ Oren Faircloth*
Oren Faircloth (Bar No. ct30530)
**SIRI & GLIMSTAD LLP**
100 Pearl Street
14th Floor - #16946876
Hartford, CT 06103
Tel: (929) 677-5181
*ofaircloth@sirillp.com*

M. Anderson Berry*
Gregory Haroutunian*
Brandon P. Jack*
**EMERY REDDY, PC**
600 Stewart Street, Suite 1100
Seattle, WA 98101
Phone: 916.823.6955

27

*anderson@emeryreddy.com*
*gregory@emeryreddy.com*
*brandon@emeryreddy.com*

Jason T. Dennett\*
**MILBERG, PLLC**
1700 7th Ave, Suite 2100
Seattle, WA 98101
Telephone: (516) 515-9124
*jdennett@milberg.com*

Gary M. Klinger\*
**MILBERG, PLLC**
227 W. Monroe Street, Suite 2100
Chicago, IL 60606
Telephone: 866.252.0878
*gklinger@milberg.com*

Terence R. Coates\*
Jonathan T. Deters\*
**MARKOVITS, STOCK
& DEMARCO, LLC**
119 E. Court Street, Suite 530
Cincinnati, OH 45202
Telephone: (513) 651-3700
*tcoates@msdlegal.com*
*jdeters@msdlegal.com*

Zachary Arbitman\*
Nicole A. Maruzzi\*
**FELDMAN SHEPHERD
WOHLGELERNTER TANNER
WEINSTOCK & DODIG, LLP**
1845 Walnut Street, 21st Floor
Philadelphia, PA 19103
Telephone: (215) 567-8300
*zarbitman@feldmanshepherd.com*
*nmaruzzi@feldmanshepherd.com*

*Counsel for Plaintiff*

\**Pro Hac Vice* applications forthcoming